2025 IL App (1st) 232035

FIFTH DIVISION
November 17, 2025

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

Nos. 1-23-2035 & 1-23-2037 (cons.)

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 12777 |
| | ) | |
| DOREATHA THOMAS, | ) | Honorable |
| | ) | Mariano R. Reyna, |
| Defendant-Appellant. | ) | Judge Presiding. |

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 12778 |
| | ) | |
| SIOBAHAN BOOKER, | ) | Honorable |
| | ) | Mariano R. Reyna |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Presiding Justice Mitchell and Justice Oden Johnson concurred in the judgment and
opinion.

**OPINION**

¶ 1     Defendant Doreatha Thomas was the owner of Integrity Medical and Physician Supplies

(Integrity), which supplied durable medical equipment directly to patients and then billed the

managed care organizations (MCOs) that contracted with the State of Illinois to provide Medicaid

coverage for such equipment. Ms. Thomas's daughter, defendant Siobahan Booker, worked as a biller at Integrity from 2017 to 2019. Following a joint bench trial for fraudulent Medicaid billing, Ms. Thomas and Ms. Booker were each convicted of theft based on the exertion of unauthorized control over the property of another (720 ILCS 5/16-1(a)(1), (A) (West 2016)), theft based on deception (*id.* § 16-1(a)(2)), and vendor fraud (305 ILCS 5/8A-3(a) (West 2016)). The theft counts each alleged that defendants stole governmental property with an aggregate value exceeding $100,000, an enhancing circumstance that elevated those offenses to non-probation-eligible Class X felonies punishable by prison terms of 6 to 30 years (720 ILCS 5/16-1(b)(6.1) (West 2016); (730 ILCS 5/5-4.5-25(a), (d) (West 2022)). The court merged the vendor fraud counts into the theft by deception counts and imposed concurrent prison terms for each defendant of six years for theft by unauthorized control and six years for theft by deception.

¶ 2    On appeal, Ms. Booker challenges the sufficiency of the State's evidence proving that any overbilling by Integrity was the result of her knowing conduct, as opposed to a mere mistake. Ms. Thomas challenges the sufficiency of the State's evidence proving either that she should be held accountable for Integrity's preparation and submission of fraudulent invoices or that the State of Illinois, rather than the MCOs it contracted with, incurred any loss as a result. Each of the defendants argue in the alternative—and the State agrees—that one of their two theft convictions should be vacated pursuant to the one-act, one-crime doctrine.

¶ 3    For the reasons that follow, we affirm in part and reverse in part, remanding this case to the trial court to (1) determine which of each defendant's two convictions, which the parties agree are for the same criminal act, should stand and (2) because we find that the State failed to prove the theft of governmental property, to reduce that remaining conviction to a Class 1 felony and impose an appropriate sentence.

¶ 4                                    I. BACKGROUND

¶ 5                                        A. Trial

¶ 6     During a three-day joint bench trial held on May 24, 25, and 26, 2023, the trial court heard from 18 witnesses, including both defendants. While the defendants were tried jointly, certain evidence—primarily defendants' own testimony—was admitted only as to one defendant.

¶ 7                                1. Medicaid Recipients

¶ 8     Ten Medicaid recipients—eight who received Medicaid benefits through Blue Cross Blue Shield (BCBS), one who received them through CountyCare, and one who received them through IlliniCare—who either had diabetes or whose children had diabetes testified that they were prescribed a Dexcom continuous glucose monitor (CGM), a device that eliminated the need for them to check blood glucose levels with finger pricks. The Dexcom CGM has three components: a sensor that is changed every seven days, a transmitter that is changed every three months, and a receiver that displays the readings. Sensors are packaged four to a box, and each prescription called for 12 to 13 boxes of sensors, an amount intended to last one year.

¶ 9     Each of these witnesses testified that he or she received at most one box of sensors from Integrity per month. Some testified that there were months when they received no sensors at all. Several of these witnesses also testified that an Integrity employee came to their home in December 2018 with a "goodie bag" of free promotional items and asked them to sign a delivery confirmation stating that they had been receiving their medical supplies from Integrity.

¶ 10                                2. MCO Investigators

¶ 11    Erin Mutter-McKeon, the lead fraud investigator at BCBS, testified that BCBS is an MCO that contracts with the State of Illinois to provide insurance coverage for Medicaid recipients. Ms. Mutter-McKeon learned in November 2018 that Integrity was an "outlier" in its use of the billing

code E 1399, a code for miscellaneous products. Five or six Medicaid recipients told her that they were not receiving the Dexcom CGM sensors that Integrity had billed BCBS for on their behalf.

¶ 12    On November 30, 2018, Ms. Mutter-McKeon sent a letter to Integrity requesting detailed billing records, including copies of the claims submitted to BCBS, proof of the medical necessity for the items, the physician's orders, mail tracking for the items, and invoices showing what Integrity had paid its suppliers.

¶ 13    In response to the letter, Integrity sent BCBS patient files, which Ms. Mutter-McKeon reviewed. Each of those files, which were admitted into evidence at trial, contained a copy of the same invoice, dated June 23, 2017, detailing the purchase of a single box of CGM sensors from the supplier Medline. That invoice listed a package price for the Dexcom sensors of $900 and a manufacturer's suggested retail price (MSRP) of $2771.86. On the invoices submitted to BCBS, Integrity had billed $2771.86 per sensor for a total of $11,087.44 per patient, per month. Some of the checks paid to Integrity by BCBS for these sensors were put into evidence and several of those were endorsed in handwriting by Ms. Thomas, where others were stamped.

¶ 14    Throughout its investigation, BCBS also discovered that although Integrity was billing for an average of four boxes per patient, per month, some patients were only receiving one box or no boxes at all. Ms. Mutter-McKeon referred the matter to the Office of the Inspector General for the Illinois Department of Healthcare and Family Services (HFS), and at HFS's direction, BCBS stopped making payments for claims submitted by Integrity in July 2019.

¶ 15    Joseph Scott testified that he is a healthcare fraud investigator for Evolent, a third-party administrator for CountyCare, another MCO that contracts with the State of Illinois to provide insurance coverage for Medicaid recipients. In late 2018 or early 2019, he learned that BCBS suspected Integrity of unauthorized billing because it was using the miscellaneous code E 1399 "at

4

a very high level." Evolent identified a CountyCare member on whose behalf Integrity had billed using that same code and discovered that Integrity had billed $88,699.52 for Dexcom supplies and CountyCare had paid $22,174.88. The patient file for that member, like the files obtained by BCBS, included a copy of the June 23, 2017, invoice from Medline showing an MSRP of $2771.86 for the Dexcom sensors.

¶ 16                                    3. Former Integrity Biller Brittney Kranz

¶ 17     Brittney Kranz testified that she worked briefly for Integrity as a medical billing specialist in March 2018. Ms. Kranz was trained by Ms. Booker, whom she identified in court, and was told by her to use the miscellaneous code E 1399 to bill for Dexcom sensors on behalf of diabetic Medicaid recipients. Based on her experience, Ms. Kranz knew both that specific codes had eventually been established for that equipment and that the amount Integrity was billing was "a little high." Ms. Kranz advised Ms. Booker that the paperwork showed a miscellaneous code even though at that time "[t]here [were] specific durable equipment codes that [were] supposed to be used, that the price billed was too high, and that the quantities of products were "too much." She told Ms. Booker that these discrepancies would "raise a red flag" for a State audit. According to Ms. Kranz, Ms. Booker said, "do it anyway because that is what your job is." Ms. Kranz continued to use the E 1399 code and bill the same amount. When she again brought her concerns to Ms. Booker, this time refusing to bill as instructed because she "knew it was not right," Ms. Booker "hysterically stood up and told [her] to leave." Understanding that she was being fired, Ms. Kranz began to gather her things, but Ms. Booker concluded that she "wasn't moving fast enough" and called the police to have her escorted from the building.

¶ 18                                    4. State Medicaid Fraud Investigators

¶ 19     Joseph Gallivan, a fraud investigator for the Illinois State Police Medicaid Fraud Control

Bureau, testified that he received a referral regarding Integrity from HFS in January 2019. Mr. Gallivan was asked to investigate allegations involving the Dexcom CGM, including inflated pricing, recipients not receiving products, and improper coding. During his investigation, he learned that Ms. Thomas owned Integrity and Ms. Booker oversaw its billing. Mr. Gallivan requested billing data, patient files, and payment statements concerning the Dexcom CGM from BCBS. He received Ms. Mutter-McKeon's report on what Integrity had been billing BCBS and the payments BCBS had made to Integrity. Mr. Gallivan interviewed several patients and learned that Integrity was billing for four boxes of sensors a month, but the recipients were only receiving one. Further, he learned that not just Medline but also DDP Medical Supply (DDP) and Wholesale Diamond Outlet (Wholesale Diamond) supplied Integrity with the Dexcom CGM sensors.

¶ 20    Invoices admitted into evidence showed that on four occasions Integrity ordered multiple boxes of CGM sensors from DDP, paying only $353 per box of four, and on nine occasions from Wholesale Diamond, paying only from $188 to $239 per box of four. There was only one invoice from Medline to Integrity, the invoice dated June 23, 2017, which showed that Integrity had purchased one box of sensors from Medline with a package price of $900 and an MSRP of $2771.96. A copy of the Medline invoice was placed in each patient file that Mr. Gallivan reviewed, and that was the purchase price Integrity used when billing BCBS. Integrity charged $2771.96 not as the package price for a box of four sensors, however, but as the unit price for each one of the four sensors it billed monthly for each Medicaid recipient, for a total $11,087.44 per recipient, per month.

¶ 21    Mr. Gallivan testified that he and his partner visited the Integrity facility on October 31, 2019. He spoke with Ms. Thomas, explained what had prompted his investigation, and interviewed her. Ms. Thomas told him that she was the CEO of the company and that in that role she "oversaw

6

everything in the company including billing." Her daughter, Ms. Booker, was the head of the billing department. Mr. Gallivan showed Ms. Thomas a patient prescription and told her that the file for that patient showed that BCBS was being billed for four boxes of CGM sensors per month rather than the single box of four sensors the patient was provided. Ms. Thomas told him "she could see that this was overbilling and that Integrity should reimburse [BCBS] for the overbilling." He showed her the Medline invoice and asked her if Integrity was obtaining CGM sensors from Medline. She told him that it was not. She admitted to only putting the Medline invoice in each patient file. He asked her if she "thought it was fair" for Integrity to put an invoice in the patient's file that indicated that it was obtaining the product for $2,771, when, in fact, it was paying as little as $190 or $353 from suppliers like DDP Medical Supply or Wholesale Diamond Outlet. Ms. Thomas explained that she got a discount for buying the product in bulk and believed it was still a "fair process" for Integrity to charge BCBS what it had been charging.

¶ 22    James Davis, a certified fraud examiner with the Illinois State Police Medicaid Fraud Control Bureau, testified that he was also referred this case by HFS. Mr. Davis received claims data from the MCOs involved—BCBS, CountyCare, and Aetna (IlliniCare was later acquired by Aetna)—and interview reports from Mr. Gallivan. He then conducted a loss calculation and financial analysis, which was admitted at trial. Mr. Davis concluded that Integrity had billed Medicaid for 768 boxes but only provided 173 boxes to Medicaid recipients, resulting in overpayments totaling $326,306.61. Mr. Davis did not also calculate any overbilling based on Integrity's use of an inflated acquisition cost for each box of sensors.

¶ 23    Mr. Gallivan was asked, on cross-examination by counsel for Ms. Thomas, how Integrity received payments for the CGM sensors, and the following exchange took place:

> Q. These payments—who makes the payment to the company?

A. It will come from the MCO but it—the arrangement is every Medicaid recipient who gets assigned a MCO Medicaid pays what's called a captation [*sic*] rate to the MCO to pay for that patient's care and there's an actuarial that actually determines that amount. If [*sic*] ultimately does come from the MCO.

Q. Before payment is made some government agency or some agency receives the bill, correct?

A. No.

Q. How is payment made without a bill?

A. Because it's being paid for by the MCO and not Medicaid so Medicaid is paying the MCO a captation [*sic*] rate so let's take [Patient A]. Medicaid is going to say this person needs X-amount of help and so we're going to pay Blue Cross Blue Shield say $400 a month and now we're saying, Blue Cross Blue Shield, it's your responsibility to process these claims.

Q. Okay. But what I'm trying to say is who does the check come from to the company—

A. Blue Cross Blue Shield."

¶ 24                                        5. Defendants

¶ 25    Defendants each testified only in their respective cases. Ms. Thomas testified that each piece of durable medical equipment provided to patients by Integrity had a code, and there was a fee schedule established by Medicaid. "We don't make the price. We follow their rules," she explained. When Integrity received a prescription for a Dexcom CGM, it contacted the prior authorization department of the MCO covering the patient in question and completed the MCO's required paperwork. Only when Integrity received an approval from the MCO could it supply the

patient with the product. It would tell the MCO what it paid for the product "and how much it goes for retail," and the MCO would decide what it was going to pay to Integrity.

¶ 26    Ms. Thomas testified that Integrity became involved with Dexcom products in 2017, when they were still new. The company received payments, from BCBS, CountyCare, and IlliniCare of roughly $11,000 per month, per Medicaid patient, beginning in 2017 and continuing until July 2019. Ms. Thomas confirmed that Integrity billed for Dexcom sensors by the unit, not by the box. Ms. Thomas recalled speaking with Mr. Gallivan, but denied ever telling him that Integrity was overbilling, that the company was not following prescriptions, or that it should reimburse BCBS for Dexcom sensors that were never provided to customers. She stated that, although she was able to acquire the product at wholesale prices, she believed the price Integrity was being reimbursed at was "still good."

¶ 27    Ms. Booker testified that from 2017 to 2019 she worked part time for Integrity—between five and eight hours per day. The amount of her paychecks varied. Sometimes she was paid weekly and sometimes biweekly. She could not remember whether she ever received a commission. She acknowledged receiving and endorsing a check made out to her from Integrity on June 19, 2108, in the amount of $10,792.68, as well as a personal check from Ms. Thomas for $45,000 with "loan" noted in the memo box. Ms. Booker acknowledged that in 2018 and 2019 she drove two different Mercedes-Benz vehicles but explained that she leased them, and they were not paid off. She agreed that Integrity was making more money than usual in 2017 and 2018 but did not think that was "only because of DexCom."

¶ 28    Ms. Booker testified that she was not the company's head biller. Ms. Kranz and two outside companies, Bill Medics and Nationwide Medical, were the primary billers. As a biller, Ms. Booker reviewed the prior authorization documents, prescriptions, and invoices, and billed patients and

9

insurers according to the approved authorization. According to Ms. Booker, the authorizations for the Dexcom CGM sensors specified that they be billed per unit and not per box. Ms. Booker recalled meeting with Mr. Gallivan on October 31, 2019. Mr. Gallivan asked her about the Dexcom CGM system and what she did for Integrity. She denied telling him that Integrity was overbilling or should reimburse BCBS for sensors that had not been delivered to customers.

¶ 29    Ms. Booker stated that Integrity's billing was correct based on the authorizations requiring Integrity to bill per sensor. She acknowledged that Integrity bought boxes of sensors for $353 from DDP Supply and submitted invoices to BCBS for $12,000, but stated that she was not responsible for purchasing nor aware of the pricing because that was not her department. Ms. Booker did not think that Integrity had overcharged for products purchased from DDP Supply, Wholesale Diamond, or Medline.

¶ 30    Ms. Booker testified that she never supervised or trained anyone at Integrity. Billers received training through videos provided by the software companies. Ms. Booker denied being told by Ms. Kranz that the company's billing was incorrect, that it was overcharging for products, that four boxes were being billed instead of one, or that there was the possibility of an audit.

¶ 31    Mr. Gallivan, recalled by the State as a rebuttal witness, testified that when he visited the Integrity facility on October 31, 2019, he also spoke with Ms. Booker. He showed Ms. Booker the prescriptions for two recipients, and Ms. Booker acknowledged that Integrity was not following the prescriptions and was overbilling for the sensors. Ms. Booker acknowledged to him at that time that Integrity should reimburse BCBS.

¶ 32                                    6. Findings of Guilt and Sentencing

¶ 33    Following closing arguments, the trial court found Ms. Thomas and Ms. Booker each guilty of all three counts. The court concluded that defendants had overcharged for the Dexcom CGM

sensors by inflating the cost at which they acquired them and had also misrepresented to the MCOs that four boxes of sensors, rather than one, were being supplied to each patient per month. The court believed that defendants both knew that what they were doing was wrong. The court stated that it found Mr. Gallivan and Ms. Kranz more credible than Ms. Thomas and Ms. Booker. It acknowledged that Mr. Gallivan did not record or memorialize his conversations with either defendant but stated that it still found him to be a credible witness. Ms. Thomas and Ms. Booker each moved for a new trial, and their motions were denied.

¶ 34 At sentencing, the court remarked that the evidence in mitigation, including the defendants' lack of criminal backgrounds and the moving testimony of their friends and family was compelling. Because these were Class X offenses, however, probation was not an option, and the court had no discretion to sentence them to less than six years. For each defendant, the court merged the count for vendor fraud into the count for theft by deception and imposed concurrent prison terms of six years for the counts of theft by unauthorized control and theft by deception.

¶ 35 Defendants separately appealed their convictions, and we consolidated the appeals for proceedings in this court. Although each defendant received a six year sentence, it appears from the Department of Corrections website (https://idoc.illinois.gov/offender/inmatesearch.html (last visited October 21, 2025)) that each was released on parole after serving less than a year in custody.

¶ 36                                  II. JURISDICTION

¶ 37 Ms. Thomas and Ms. Booker were sentenced on October 24, 2023, and each filed a notice of appeal the same day. We have jurisdiction over these consolidated appeals under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb 6, 2013) and Rule 606 (eff. July 1, 2017), which together govern appeals from final judgments in criminal cases.

¶ 38                                     III. ANALYSIS

¶ 39                          A. Sufficiency of the State's Evidence

¶ 40    We first address defendants' arguments that the State's evidence was insufficient to support their convictions for theft. It is well established that a defendant may not be convicted "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Yet we do not retry a defendant when reviewing a challenge to the sufficiency of the evidence. *People v. Mosley*, 2023 IL App (1st) 200309, ¶ 18. We instead consider " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In a bench trial, "it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). We will reverse a conviction on appeal only where the evidence presented was so improbable, unreasonable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *People v. Gray*, 2017 IL 120958, ¶ 35. This same standard applies when a challenge is made to the sufficiency of the evidence supporting a finding necessary for application of a sentencing enhancement. *People v. Nevarez*, 2012 IL App (1st) 093414, ¶ 66

¶ 41    The theft statute outlines five ways in which a defendant may knowingly exercise control over property and three conditions that may concurrently be present. 720 ILCS 5/16-1(a) (West 2016). A conviction for theft will result if the State proves beyond a reasonable doubt that the defendant employed any one of the five methods of control and any one of the three conditions was present. *Id.* The State alleged here, under subsection (a)(1), (A) of the theft statute, that

defendants each knowingly obtained or exerted unauthorized control over property while intending to permanently deprive its owner of its use or benefit. *Id.* § 16-1(a)(1)(A). And it alleged under subsection (a)(2), (A) that defendants each knowingly obtained property by deception, also while intending to permanently deprive its owner of its use or benefit.

¶ 42                                    1. *Mens Rea* (Ms. Booker)

¶ 43    Ms. Booker argues on appeal that the State's evidence, including the testimony of Ms. Kranz and Mr. Gallivan, was insufficient to prove that she possessed the requisite criminal intent— *i.e.*, that she "knowingly" overbilled for the CGM sensors. Ms. Booker maintains that her job at Integrity consisted of mere data entry, that she simply "inputted" information from prior authorization forms, and that she had no authority to deviate from what was contained in those documents. At most, she insists, the evidence at trial revealed that she made a mistake.

¶ 44    "The knowledge and intent necessary for a theft charge need not be proven by direct evidence and may, instead, be proven indirectly by inference or by deduction made by the trier of fact based upon the facts and circumstances of the case." *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 32. "Evidence of intent to permanently deprive the owner of property is usually circumstantial, including inferences drawn from the facts and circumstances as well as 'the act of theft itself.' " *People v. Moore*, 2021 IL App (1st) 172811, ¶ 205 (quoting *People v. Kotero*, 2012 IL App (1st) 100951, ¶ 31).

¶ 45    Here, taking the evidence in the light most favorable to the State, as we must, we find that a rational trier of fact could have concluded that Ms. Booker had the requisite knowing state of mind for a conviction of theft. The evidence at trial established that a box of Dexcom CGM sensors contained four sensors, that each sensor lasted seven days, and that each prescription called for 12 to 13 refill boxes of sensors intended to last a patient a full year. Yet Integrity routinely billed

MCOs for four times this amount. Integrity also purchased boxes of sensors from different suppliers, paying as little as $188, $239, or $353 per box, while billing MCOs $2771.86 per sensor and $11,087.44 per box, the MSRP indicated on a June 23, 2017, invoice from Medline, a copy of which Integrity placed in each patient file.

¶ 46    Ms. Kranz testified that Ms. Booker trained her and that Ms. Booker was Integrity's primary biller. When Ms. Kranz first confronted Ms. Booker to voice her concerns that Integrity was billing incorrectly and for "too much," Ms. Booker dismissed those concerns. When Ms. Kranz raised the issue again, this time refusing to bill for the amount of units at the price specified because she knew it was not right, Ms. Booker fired her. Mr. Gallivan testified that his investigation revealed that Ms. Booker admitted to him that Integrity was not following the prescription orders, was overbilling, and should reimburse BCBS for the additional sensors that BCBS had paid for but that Integrity never provided. This testimony was sufficient to prove Ms. Booker guilty of theft beyond a reasonable doubt. *Siguenza-Brito*, 235 Ill. 2d at 228 ("the testimony of a single witness, if positive and credible, is sufficient to convict"). It was also corroborated by the documentary evidence, which revealed that Integrity overbilled for the Dexcom sensors by both inflating the price paid and by charging that price for each sensor, rather than each box of sensors.

¶ 47    Ms. Booker is essentially asking this court to reassess the credibility of these witnesses and to reweigh the evidence in her favor. The trial court, as finder of fact, was responsible for those determinations. *Siguenza-Brito*, 235 Ill. 2d at 228. The trial court found both Ms. Kranz and Mr. Gallivan to be credible witnesses, even after expressly considering the fact that Mr. Gallivan did not record or memorialize his conversations with either Ms. Thomas or Ms. Booker, making it essentially his word against theirs. We will not substitute our judgment for that of the trial court

14

on such matters. *People v. Patterson*, 314 Ill. App. 3d 962, 969 (2000). Taken as a whole, we do not find that the evidence at trial was "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Bradford*, 2016 IL 118674, ¶ 12.

¶ 48    Viewed in the light most favorable to the State, we conclude that sufficient evidence supported Ms. Booker's convictions for theft.

¶ 49                                   2. *Actus Reus* (Ms. Thomas)

¶ 50    Ms. Thomas argues the State failed to prove either that she personally committed the *actus reus* of submitting fraudulent bills or that she should be held accountable for Ms. Booker doing so. Section 5-5 of the Criminal Code of 2012 provides that "[a] person is legally accountable for conduct which is an element of an offense and which, in the name or in behalf of a corporation, he performs or causes to be performed, to the same extent as if the conduct were performed in his own name or behalf." 720 ILCS 5/5-5(a) (West 2016). Ms. Thomas correctly notes that the officer of a corporation is not automatically accountable for the crimes of the corporation merely because he or she is an officer. As we explained in *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2013 IL App (1st) 093547, ¶ 81, "[a]s in all accountability cases, the trier of fact [is] still required to find an *actus reus*—the promotion or facilitation of an illegal act." See also *People v. Peterson*, 273 Ill. App. 3d 412, 419-20 (1995) (accountability requires proof that an accomplice in some way aided, encouraged, or incited a crime).

¶ 51    But the State did not rely exclusively on Ms. Thomas's role as the owner and CEO of Integrity to prove that she was guilty of the overbilling charged here. It relied on her admission to Mr. Gallivan that she specifically oversaw, not only purchasing and delivery, but billing. In addition, when the State asked Mr. Gallivan, "Did she admit to only putting the Medline invoice into each of the files?" he replied, "She did." Thus, according to Mr. Gallivan,  the June 23, 2017,

15

invoice, which showed that Integrity had purchased one box of sensors from Medline with a package price of $900 and an MSRP of $2771.96 and which was a key part of the State's case, was put into the files by Ms. Thomas. Ms. Thomas now argues that this did not mean that she personally put that invoice in each of the files and that Mr. Gallivan's response can only be interpreted this way "because of the way the prosecutor phrased the question." But defense counsel was free to clear that up on cross-examination, or to ask his own witness whether she was the one to place the Medline invoice in each file, and did not. As noted above, "the testimony of a single witness, if positive and credible, is sufficient to convict" (*Siguenza-Brito*, 235 Ill. 2d at 228), and the trial court, as the finder of fact here, made clear that it found Mr. Gallivan to be a compelling witness.

¶ 52    Ms. Thomas also argues that this purported admission to Mr. Gallivan was relevant only to the State's theory that Integrity had overbilled by inflating the price it paid for sensors and had nothing to do with its theory that Integrity also fraudulently billed the per-box price for each single sensor. She contends that the State did not establish that a loss of over $100,000 resulted from just the first theory alone. We reject this level of parsing. The evidence at trial suggested that Integrity was a small family business operated by a mother-daughter team, and a reasonable trier of fact was entitled to believe that Ms. Thomas was aware of and contributed to the fraudulent scheme in its entirety.

¶ 53    Although the State's case against Ms. Thomas was largely circumstantial, we have recognized that "most cases of this nature are" because "[p]eople rarely advertise their criminal intent." *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 192. We concluded in *Oglesby* that the State's evidence was sufficient to find that the deputy chief of staff for the former president of a county board of commissioners steered contracts to vendors knowing that those vendors would not

perform the work. *Id.* ¶ 194. Although it was certainly possible, viewing each piece of evidence in that case in isolation, to formulate an innocent explanation, we held that "the able and experienced trial judge considered all of the evidence and made a common-sense appraisal of how the pieces fit" to establish a fraudulent scheme. *Id.* ¶ 193. The same can be said here.

¶ 54    Viewed in the light most favorable to the State, we conclude that sufficient evidence supported Ms. Thomas's convictions for theft.

¶ 55              3. Proof Required for Sentencing Enhancement (Both Defendants)

¶ 56    Ms. Thomas also specifically argues that the State failed to prove beyond a reasonable doubt that the funds in question were governmental property. She maintains that the MCOs entered into contracts with the State of Illinois under which they agreed, in exchange for a fixed monthly payment per Medicaid recipient referred to as a capitation rate, to provide Medicaid coverage for those individuals. It is the MCOs, she insists, that would have incurred losses from the overbilling alleged here, and the State presented no evidence that such losses were passed on to HFS or the State of Illinois.

¶ 57    This argument applies equally to Ms. Booker. The State alleged that each defendant stole governmental property with an aggregate value exceeding $100,000, an enhancing circumstance elevating the charges of theft to probation-ineligible Class X felonies punishable by 6 to 30 years (720 ILCS 5/16-1(b)(6.1) (West 2016); (730 ILCS 5/5-4.5-25(a), (d) (West 2022)). Theft of the same amount of nongovernmental property is a probation-eligible Class 1 felony punishable by 4 to 15 years (720 ILCS 5/16-1(b)(6) (West 2016); (730 ILCS 5/5-4.5-30(a), (d) (West 2022)). Defendants' convictions were based on the theft of the same aggregate funds, and the trial court sentenced them both under subsection 16-1(b)(6.1) of the theft statute (720 ILCS 5/16-1(b)(6.1) (West 2022)) to six years in prison, the minimum sentence for a Class X felony (730 ILCS 5/5-

4.5-25(a), (d) (West 2022)).

¶ 58    The State insists that we should read a stray comment in Ms. Booker's brief, in which she refers to the State  as "the owner of the property," as a concession that the funds here were governmental property and an affirmative waiver of any argument to the contrary. We disagree. Waiver is the "intentional relinquishment of a known right" (*Gallagher v. Lenart*, 226 Ill. 2d 208, 229 (2007)), and the statement the State relies on does not clearly express such an intention.

¶ 59    At most, the State could argue that Ms. Booker's failure to specifically focus on whether the State had proved that the theft was of governmental funds amounted to forfeiture. However, we do not view Ms. Booker as necessarily having forfeited this argument. Ms. Booker has expressly claimed that the State's evidence was insufficient to support her convictions, and the argument that the State failed to prove that there was a theft from the government supports that claim. Thus, it is not necessarily clear that there has been a forfeiture.

¶ 60    And even if this argument was forfeited, "[f]orfeiture is a limitation on the parties, not the court. In the exercise of our discretion, we may address even forfeited issues." *People v. Custer*, 2019 IL 123339, ¶ 19; see also *People v. Acosta*, 2024 IL App (2d) 230475, ¶ 15 ("[W]e may overlook forfeiture where necessary to obtain a just result or maintain a sound body of precedent." (citations omitted)).

¶ 61    In this case the defendants were jointly tried for the theft of the same funds; they have both challenged the sufficiency of the State's evidence to support their convictions, and the State, represented by the same counsel in both appeals, has had ample opportunity to address this particular aspect of the sufficiency argument, both in its briefing and at oral argument. Under these circumstances, the just result, in our view, is to consider this argument as it applies to both defendants.

¶ 62    The State insists that it proved the enhancing circumstance that the funds were governmental property simply by establishing that the funds in question were paid to Integrity as part of the state-administered Medicaid program. However, obtaining payments in excess of what one is entitled to from a government program is a different crime—a violation of section 8A-3 of the Illinois Public Aid Code, under which defendants were separately charged with vendor fraud (see 305 ILCS 5/8A-3 (West 2016)) (making it a violation for a person or entity to fraudulently "obtain benefits or payments *under this Code* to which he or it is not entitled" (emphasis added))). Subsection (b)(1.6) of the theft statute, however, is quite specific. The theft of over $100,000 is a Class X felony only if it "was committed in a school or place of worship or if the theft was of *governmental property*." (Emphasis added.) 720 ILCS 5/16-1(b)(6.1) (West 2016). For the enhancement to apply, the theft must be not just from a governmental program, but of governmental property.

¶ 63    The State also argues that "when administering the state-run Medicaid program on the [S]tate's behalf, an MCO acts as an agent of the [S]tate," and the State "always retains supervisory authority over the administration of the Medicaid program." It cites a federal case, *K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 109-10 (4th Cir. 2013), in which Medicaid beneficiaries sued both their state health department and the MCO that managed the delivery of their Medicaid services pursuant to a contract with the state, alleging that a reduction in their services violated their right to due process. The MCO appealed from a preliminary injunction entered in the plaintiffs' favor, but the state health department did not join in that appeal. *Id.* The Fourth Circuit held that the MCO, as an agent of the state, could not challenge the injunction when the state itself had chosen not to do so. *Id.* at 115-16.

¶ 64    The State's argument here appears to be that because the State always retains supervisory

authority over an MCO's role in the Medicaid program, it also retains a property interest in funds paid by the MCO to entities like Integrity. But the discussion in *K.C.* regarding the outer limits of an agency's ability to delegate its statutory responsibilities does not touch on that question at all. With no contractual or transactional record establishing how the costs associated with overpayments to Integrity were borne by the State, we fail to see how a trier of fact could have determined that the funds at issue here were governmental property.

¶ 65    If anything, testimony from Mr. Davis, the State's Medicaid fraud examiner, appears to support Ms. Thomas's contention that the State itself incurred no losses. He explained that payments "come from the MCO," that "the arrangement" is that Medicaid pays an actuarially determined capitation rate—a fixed amount per patient, per month—to the MCO in exchange for the MCO agreeing to cover that patient's care. According to Mr. Davis, the government agency never receives a bill "[b]ecause it's being paid for by the MCO and not Medicaid." Once the capitation payment is made, it's the MCO's responsibility to process the claims. Given this testimony, we agree with Ms. Thomas that, absent any evidence to the contrary regarding the actual financial arrangements between HFS and the MCOs, a trier of fact could not reasonably presume that the funds defendants were found guilty of stealing were governmental property.

¶ 66    This brings us to the State's primary argument: that regardless of what was presented at trial, we may take judicial notice now of the fact that the theft here was of governmental property. It is true, under our rules of evidence, that "[j]udicial notice may be taken at any stage of the proceeding" (Ill. S. Ct. R. 201(f) (eff. Jan. 1, 2011)), even for the first time on appeal, and even of a fact constituting an element of the offense (*People v. Castillo*, 2022 IL 127894, ¶¶ 38-42). In *Castillo*, for example, our supreme court found no abuse of discretion when this court took judicial notice, for the first time on appeal, of the fact that the State owned the prison where an alleged

20

battery took place—a circumstance that elevated the offense to aggravated battery. *Id.* ¶¶ 22, 38,

¶ 67    The question remains, however, whether the source of the stolen funds in this case is, like the question of the prison's ownership in *Castillo*, a proper subject for judicial notice. Rule 201 provides that "[a] judicially  noticed fact must be one not subject to reasonable dispute" because it is either "generally known within the territorial jurisdiction of the trial court" or is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Ill. R. Evid. 201(b) (eff. Jan. 1, 2011).

¶ 68    Facts this court has taken judicial notice of include matters of common knowledge, such as the intoxicating nature of alcoholic beverages (*Starns v. Postawko*, 347 Ill. App. 77, (1952)), the types of services offered by a currency exchange (*Western & Lake Check Cashers, LLC v. Propane Pete, LLC*, 2023 IL App (2d) 220291, ¶ 27), and the fact that cell phones can be used to transmit and store electronic communications (*People v. Gliniewicz*, 2018 IL App (2d) 170490, ¶ 50); matters of local knowledge, such as the location of pedestrian sidewalks (*Peters v. Riggs*, 2015 IL App (4th) 140043, ¶ 50) or public transportation lines (*Miller v. Chicago Transit Authority*, 78 Ill. App. 2d 375, 382-83 (1966)); census data (*In re Marriage of Aud*, 142 Ill. App. 3d 320, 325 (1986)); basic arithmetic calculations (*People v. Cruz*, 2019 IL App (1st) 170886, ¶ 42); the recorded temperature and meteorological conditions on a particular day (*People v. Maxfield*, 2023 IL App (1st) 151965-C); and information found in official government documents or on government websites, such as filings and electronic dockets in other court cases (*Boston v. Rockford Memorial Hospital*, 140 Ill. App. 3d 969, 972 (1986)), the written decisions of other tribunals (*Bank of America, N.A., v. Kulesza*, 2014 IL App (1st) 132075, ¶ 21), public information regarding inmates found on the Illinois Department of Corrections website (*People v. Henderson*, 2011 IL App (1st) 090923, ¶ 8), corporate records available on the Secretary of State's

website (*Maldonado v. Creative Woodworking Concepts, Inc.*, 296 Ill. App. 3d 935, 938 (1998)), and municipal zoning ordinances (*City of Countryside v. Oak Park National Bank*, 78 Ill. App. 2d 313, 315 n. 1 (1966)).

¶ 69    Here, the State asks us to take judicial notice not of the location of a sidewalk or the existence of a court filing but of the internal operations of a complex benefits program jointly operated by the federal and state government through contractual arrangements with various third parties. The State devotes over eight pages of its brief to convincing us that we may do so, citing numerous provisions of the federal Medicaid statute, making legal arguments regarding what constitutes an ownership interest, and asking us to conclude that the State of Illinois would be obligated to reimburse the federal government for at least a portion of any overpayments that the MCO's made to Integrity.

¶ 70    We have routinely declined to take judicial notice of facts involving this level of complexity. We concluded in *In re Marriage of Jones*, 2022 IL App (5th) 210104, ¶ 22, for example, that although we could take judicial notice of the existence of a worldwide pandemic and the specific restriction imposed by the state government in response to it, we could not take judicial notice of a party's alleged reduction in income due to those restrictions, as the matter was complicated by the availability of multiple federal assistance programs and other factors. We likewise declined, in *In re Marriage of Aud*, 142 Ill. App. 3d 320, 325 (1986), to take judicial notice of the proposition that one who returns to the work force late in life will likely have little retirement income and be required to rely on public assistance, concluding that entitlement to such assistance "involved a multitude of considerations other than the current income of applicants." And, while we have taken judicial notice that real estate values can vary greatly from block to block in a city, that the value of land may change rapidly, and that property values increased

22

steadily over a particular period (see 18 Ill. Law and Prac. Evidence § 10, "Judicial notice of property matters" (collecting cases)), we have generally "refrain[ed] from taking judicial notice of the value of specific realty inasmuch as innumerable factors may affect such value" (*Sanborn v. Sanborn*, 78 Ill. App. 3d 146, 150 (1979).

¶ 71   We similarly decline to take judicial notice that the funds in question here constituted governmental property. This is neither a matter of common knowledge nor a fact "capable of accurate and *ready* determination." (Emphasis added.) Ill. R. Evid. 201(b) (eff. Jan. 1, 2011). It is one that would require us, at best, to not only consult but interpret federal statutes and draw a number of legal and factual conclusions. And at worst, as Mr. Davis's testimony and Ms. Thomas's arguments suggest, it could require us to construe private contracts that are not before us or hear competing expert testimony. The matter is simply not an appropriate one for judicial notice.

¶ 72   We agree with the State, however, that defendants are entitled only to resentencing and not to the outright reversal of their theft convictions. Subsection (b)(6.1) of the theft statute appears under the heading "Sentence" and is clearly a sentencing enhancement listed separately from the elements of the offense (720 ILCS 5/16-1(b)(6.1) (West 2016)), which are found in subsection (a) of the statute (*id.* § 16-1(a)). Ms. Thomas does not dispute this but has argued in her reply brief and at oral argument in this court that, by identifying the stolen property in the charging instrument as property belonging to the State of Illinois, the State made that an element of the offense that it was then required to prove and not just an enhancing circumstance for sentencing purposes. In support of this argument, she relies on our supreme court's opinion in *People v. Espinoza*, 2015 IL 118218. The defendant in that case argued the State's charging instrument was deficient because it identified the victim of the alleged domestic battery only as "a minor." *Id.* ¶¶ 3, 4. Although the statute defining the offense did not expressly make the name of the victim an element of the

offense, the court concluded that "[w]here an indictment charges an offense either against persons or property, the name of the person or property injured, if known, must be stated, and the allegation must be proved as alleged." (Internal quotation marks omitted.) *Id.* ¶ 17.

¶ 73 As the *Espinoza* court clarified, however, this rule applies only where the alleged offense, like domestic battery, is one in which "the impact is focused upon an individual." *Id.* ¶ 20. The court referenced its earlier decision in *People v. Jones*, 53 Ill. 2d 460 463 (1973), where it had distinguished a charge of armed robbery, which it concluded was focused on the individual victim and the danger to that person, from charges of forgery or the sale of narcotics, where the impact of those two offenses was focused more upon society in general. *Id.* ¶ 18. We have previously recognized that "burglary is a crime against property, where the identity of the property owner is not a necessary element." *People v. Stephenson*, 2016 IL App (1st) 142031, ¶ 27. Similarly, the theft alleged here—Medicaid fraud carried out over many transactions—is not directed at an individual. Nothing in *Espinoza*, therefore, required the State to prove that the government was the owner of these funds because it was an element of the offense charged.

¶ 74 What Ms. Thomas is really arguing is that there was a variance between what was alleged in the charging instrument and the State's proof at trial. For such a variance to be fatal, however, it must be material and "of such character as may mislead the accused in making his defense or expose him to double jeopardy." *People v. Davis*, 82 Ill. 2d 534, 539 (1980). Ms. Thomas does not assert that she was misled by the State's allegations regarding the nature or identity of the stolen funds here. Nor does she argue that the State's allegations leave her vulnerable to being charged again for the same crime. The closest Ms. Thomas comes to arguing prejudice is the statement in her reply brief that if she had known she would be tried for stealing from an insurance company, a victim she apparently believes a jury would have found less sympathetic, she "*may well have*

24

elected a jury trial." (Emphasis added.) This noncommittal assertion is, in our view, entirely unpersuasive as a claim of prejudice.

¶ 75 Because the State failed to prove that defendants stole more than $100,000 in governmental funds, their sentences under the Class X sentencing scheme must be vacated, and they should be resentenced for theft of the same amount of nongovernmental property under the Class 1 sentencing scheme.

¶ 67 B. Violation of the One-Act, One Crime Doctrine (Both Defendants)

¶ 68 Defendants also argue that one of their two respective theft convictions must be vacated under the one-act, one-crime doctrine. The State agrees. Although defendants failed to raise this issue below, our supreme court has recognized that "an alleged one-act, one-crime violation is reviewable under the second prong of the plain-error doctrine because it effects the integrity of the judicial process." *People v. Smith*, 2019 IL 123901, ¶ 14.

¶ 69 The one-act, one-crime doctrine "prohibits convictions for multiple offenses that are based on precisely the same physical act." *Smith*, 2019 IL 123901, ¶ 13. When two convictions are entered for the same act, a "sentence should be imposed on the more serious offense and the less serious offense should be vacated." *People v. Artis*, 232 Ill. 2d 156, 170 (2009). When considering whether a violation of this doctrine has occurred, our review is *de novo*. *Smith*, 2019 IL 123901, ¶ 15.

¶ 70 "A series of closely related acts may be considered a single act for purposes of the one-act, one-crime rule when the State charges the acts as a single course of conduct." *People v. Bailey*, 49 Ill. App. 3d 574, 595 (2011). That is what happened here. The state charged each defendant with two counts of theft, one based on the exertion of unauthorized control, between June 24, 2017, and July 22, 2019, over funds with an aggregate value exceeding $100,000, and one based on

obtaining those same funds by deception. Because the same "act" underlies both charges, the less serious conviction should be vacated. *Id.*

¶ 71 To determine which offense is more serious, we look first to the statute defining the offenses to determine whether a greater punishment is provided for one than the other. *In re Samantha V.*, 234 Ill. 2d 359, 379 (2009). The statute here draws no distinction, for sentencing purposes or otherwise, between theft through the exertion of unauthorized control and theft by deception. 720 ILCS 5/16-1 (West 2023). Because, as discussed above, the State failed to prove that the stolen property belonged to the government, the sentencing enhancement in section 16-1(b)(6.1) does not apply, and each offense is a probation-eligible Class 1 felony punishable by 4-15 years (720 ILCS 5/16-1(b)(6) (West 2016); (730 ILCS 5/5-4.5-30(a), (d) (West 2022)). We next consider which offense has the more culpable mental state. *In re Samantha V.*, 234 Ill. 2d at 379. Here again, it is the same for theft by the exertion of unauthorized control as it is for theft by theft by deception—the defendant must act knowingly. 720 ILCS 5/16-1(a)(1), (a)(2) (West 2016).

¶ 72 Where we cannot determine the more serious offense under either of these steps, our supreme court has advised us to remand to the trial court to make the determination. *Artis*, 232 Ill. 2d at 177. On remand, we direct the trial court, for each defendant, to vacate one of the theft convictions as the less serious offense before imposing a new sentence.

¶ 73                                    IV. CONCLUSION

¶ 74 For the above reasons, we affirm the trial court's findings of guilt as to each defendant for theft by the exertion of unauthorized control and theft by deception; we conclude that the State failed to prove that the property stolen was governmental property warranting a Class X sentencing enhancement; and we agree with the parties that under the one-act, one-crime doctrine, only one of each of the defendant's two convictions may stand. We remand for the trial court to determine

which of those convictions should be vacated and for it to resentence defendants under the Class 1 sentencing framework.

¶ 75    Affirmed in part and reversed in part.

¶ 76    Cause remanded.

*People v. Thomas*, **2025 IL App (1st) 232035**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 21 CR 12777 and 21 CR 12778; Mariano R. Reyna, Judge presiding. |
| **Attorneys for Appellants:** | James E. Chadd, Douglas R. Hoff, and Ryan Miller, of the State Appellate Defender's Office, of Chicago, for appellant Doreatha Thomas. |
| | James E. Chadd, Douglas R. Hoff, and Deepa Punjabi, of the State Appellate Defender's Office, of Chicago, for appellant Siobahan Booker. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General of Illinois, of Chicago (Jane Elinor Notz, Solicitor General; Katherine M. Doersch, Criminal Appeals Division Chief, and Jeremy M. Sawyer, Assistant Attorney General, of counsel), for the People. |