2026 IL App (2d) 260150-U
No. 2-26-0150
Order filed June 29, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

LICURGO R. DIAZSANDI, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable Lark Cowart & Bianca Camargo, Judges, Presiding.
No. 26-CF-535

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Kennedy and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court did not err in granting the State's petition to detain defendant for trial; defendant is charged with a detainable offense (*inter alia* attempted murder of a police officer), is a danger to the community, and no less restrictive conditions would mitigate the danger he presents.

¶ 2    Defendant, Licurgo R. Diazsandi, appeals from the circuit court's order denying his request for release under the Pretrial Fairness Act (the Act) (725 ILCS 5/110-6.1 *et seq.* (West 2024), while he awaits trial on multiple offenses. The appellate defender has declined to file a memorandum on defendant's behalf and, after examining the record and the motion for relief, we agree with the circuit court's findings and affirm its judgment.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was charged by complaint with attempt first-degree murder of a police officer

(720 ILCS 5/8-4(a), 9-1(a)(1) (West 2024)), two counts of armed violence with a category II

weapon (*id*. § 33A-2(a)), attempt to disarm a peace officer (*id*. § 31-1a(b)), aggravated assault to

a peace officer with a weapon (*id.* § 12-2(b)(4)), criminal damage to government property (*id*. §

21-1.01(a)(1)) and resisting arrest (*id*. § 31-1(a)(1)). The first five charges are non-probationable,

detainable offenses. 725 ILCS 5/110-6.1(a)(1) (West 2024).

¶ 5      After defendant reported that he is unemployed and homeless, the circuit court (Judge Lark

Cowart) appointed the public defender to represent him. The court admonished defendant on the

charges and the parties proceeded to a pretrial detention hearing based on proffers. The State

tendered a St. Charles police synopsis concerning defendant's arrest. The defense tendered a 51-

second video clip from one of the officer's body-worn cameras but stated that the prosecution had

tendered "hours" of bodycam footage. Although both parties and the court referenced video files

of different lengths—such as one video that was "3 minutes and 59 seconds," and body-cam

footage from other officers at the scene—the *only* exhibit that was transmitted to the appellate

court clerk was the 51-second video the defense submitted from one officer's camera. We merely

note the irregularity as what we have received is sufficient for our review. Still, as the party

challenging the judgment, defendant was obliged to provide this court with the evidence that was

presented to the circuit court, and we have been given no explanation for its absence. See *Foutch

v. O'Bryant*, 99 Ill. 2d 389, 394 (1984) ("[w]here it is alleged that the evidence presented was

actually insufficient to support the court's finding, the burden of preserving said evidence rests

with the party who appeals from said order").

¶ 6    In any event, the police synopsis provides context for what occurred before the sole recording in the record. Prior to this incident, defendant and one Stephen Johnson were drinking at a bar in downtown St. Charles. They left and began walking east on Main Street, also known as Route 64. At around 11:00 p.m. on March 6, 2026, St. Charles police officers were dispatched to conduct a welfare check for a subject (later identified as defendant) "running in and out of traffic" on Main Street. As the marked patrol car passed defendant and Johnson, defendant threw an object at the vehicle, damaging it slightly, which was later determined to be a knife. The patrol car, driven by Officer Christopher Morales, then pulled over and stopped.

¶ 7    The bodycam footage picks up at this point from the perspective of Officer Morales. Morales exited the car and asked defendant, as he was walking in the roadway, why he would throw something at the car. Morales stated that he hadn't done anything to defendant, to which defendant replied, "Because you're a cop." Defendant started to jog away from Morales, and in the direction of Johnson, and stated, "I got a knife." At this time, Sergeant Cory Krupke can be seen approaching defendant as well, and he entered the frame to the left of Morales. Both officers shined their flashlights on defendant as defendant said, "I've got a knife," "I'm ready to die," "leave me alone," and "I did not consent." All of the officers on scene were in uniform.

¶ 8    Defendant continued to walk away from the officers, but then he abruptly turned around and, with a knife in his right hand, charged directly at Krupke. Morales drew his pistol and fired a single shot at defendant and missed. Krupke, however, discharged his taser, which struck defendant. As defendant tried to run away, he was incapacitated by Krupke's taser and fell to the ground. As Krupke and another officer, Raymond Garcia, attempted to handcuff defendant, he started struggling with the police, and stated that he wanted to go home and that he hated his life. The footage then abruptly ends.

¶ 9    According to the synopsis, as they struggled to get defendant in custody, defendant attempted to grab Garcia's taser. During the struggle, defendant continued to yell "I'm going to kill all you n******s," and "I'm gonna kill all cops." Later, defendant acknowledged charging at Krupke with a red knife in his right hand, holding it "Call of Duty style" with the blade pointing down from his fist. Defendant stated that he was running in the street and confronted the police because he wanted to get their attention and because he wanted to commit "suicide by cop." Defendant also admitted to grabbing the officers' equipment as he resisted arrest. The synopsis then states, "*The* knife was later located on scene and was determined to have a length of approximately 2.5-3 [inch] blade." (Emphasis added.)

¶ 10    This latter sentence caused some consternation at the initial detention hearing, which we can briefly address here. First, the armed violence statute defines a dangerous, or "category II," weapon to include a "knife with a blade of at least 3 inches in length, dagger, dirk, switchblade knife, stiletto, axe, hatchet, *or other deadly or dangerous weapon or instrument of like character*." (Emphasis added.) 720 ILCS 5/33A-1(c)(2) (West 2024). The emphasized text, the statute's residual clause, has long been understood to mean that, while a knife with a three-inch blade is *per se* a dangerous weapon, a shorter knife or blade-type weapon can *also* be a "deadly or dangerous" weapon because it is "of like character." See, *e.g.*, *People v. McCoy*, 2026 IL App (1st) 231052, ¶¶ 32-49 (sharp knife of unspecified length); *People v. Mares*, 2018 IL App (2d) 150565, ¶ 11 (box cutter of unspecified length); *People v. Westerfer*, 169 Ill. App. 3d 59, 62 (1988) (one-inch utility blade).

¶ 11    At the initial detention hearing, however, defense counsel argued that the length of the knife was insufficient for probable cause to believe defendant had committed armed violence because the knife "needs to be *greater* than 3 inches." (Emphasis added.) Further counsel asserted

that defendant *could not* have charged at Krupke with a knife at all because only one knife was recovered, which counsel believed was the knife that was thrown at the squad car. Counsel maintained that the weapon must have been some other object. (Counsel never accounted for the possibility that defendant threw the knife at the squad car, retrieved it, and then used the same knife to charge at Krupke, that police never recovered the knife that was thrown at the squad car, and never addressed defendant's admission that he charged at Krupke with a knife.) Counsel also argued that the video did not show that defendant attempted to grab a taser and did not show that defendant resisted arrest.

¶ 12    With respect to conditions, defense counsel noted that a condition that defendant not interact with the police unless there was a genuine emergency would *not* be successful. Counsel reasoned that because defendant was "unhoused," that release condition would not "stop the police from over-policing a vulnerable population." Counsel suggested defendant would be amenable to electronic home monitoring (EHM) at his mother's residence. Counsel further argued that she did not "believe the evidence supports that this actually involved a weapon, that this is actually an attempted murder."

¶ 13    The record paints a murky picture regarding defendant's criminal history, of which neither side offered a complete summary. Nevertheless, we have taken judicial notice of the circuit clerk's online docket for our own clarification. See *People v. Thomas*, 2025 IL App (1st) 232035, ¶ 68. At the time of his arrest, defendant was on probation for criminal trespass to land in two separate cases (25-CM-312 & 25-CM-1356), and under court supervision for retail theft (25-CM-312). In addition, defendant appears to have three pending misdemeanor cases: for criminal damage to property (26-CM-107), for criminal trespass to land and assault (26-CM-163), and for criminal trespass to state-supported property (26-CM-557). At the hearing, the prosecutor mentioned that

defendant has a 2024 conviction for aggravated assault, but it appears that conviction was from a different jurisdiction.

¶ 14    The circuit court initially found that because defendant's knife was not *longer* than three inches, there was no probable cause on the armed violence counts. In addition, the court stated that it did not appear that defendant resisted arrest or attempted to disarm any officer of his taser and found no probable cause on the resisting or disarming counts. However, the court found probable cause on the attempt murder and aggravated assault counts, which are detainable offenses, as well as criminal damage to property. The court found that defendant did use a weapon to carry out the offense and that he "charged at peace officers with a knife." The court also expressed concern about defendant's mental health, but noted the danger inherent in "trying to get the attention of the police" and provoking the use of deadly force to commit "suicide by cop." The court further commented that defendant's act of walking out into traffic endangered "the other people driving on the road." The court determined that defendant posed a real and present threat to the safety of the community and that while no conditions could mitigate that threat, defendant was also not likely to comply with them.

¶ 15    The defense filed a motion for relief, which generally argued that the State's evidence at the initial detention hearing was not clear and convincing. The case was assigned to a felony courtroom (Judge Bianca Camargo), where the motion for relief was heard. Both sides largely reiterated the arguments made at the initial detention hearing, but the State pointed out that the initial judge erred in her interpretation of the armed violence statute, because a knife shorter than three inches can still be a dangerous weapon under the statute's residual clause. See 720 ILCS 5/33A-1(c)(2). The circuit court agreed with the State. The court noted how defendant described holding the knife, edge down—again, "Call of Duty style"—as he charged at Krupke. The court

- 6 -

determined that defendant's violent, assaultive conduct with a weapon was inherently dangerous. The court expressed its concern for defendant's mental health, but noted that his suicidal ideation could have potentially lethal consequences for himself and others, making him a danger to the community. The court indicated that no release conditions were appropriate and stated that there were also no "assurances that the defendant would be able to follow any conditions" as he could not "follow the rules of probation [and] not pick up any new criminal offenses." Defendant timely appealed and the circuit court appointed the Office of the State Appellate Defender to represent him.

¶ 16                                    II. ANALYSIS

¶ 17    Before this court, the appellate defender has declined to file a memorandum on defendant's behalf. The State's memorandum asserts that the circuit court correctly considered the appropriate factors when it reviewed defendant's motion for relief, and that we should reach the same conclusion. We agree with the State.

¶ 18    Pursuant to 725 ILCS 5/110-6.1 (West 2024), the State may seek pretrial detention based on the defendant's dangerousness or risk of willful flight. Here, the State's petition to detain proceeded under the allegation of defendant's dangerousness, and the parties proceeded by way of proffer. Under the dangerousness standard, the State must prove by clear and convincing evidence that (1) "the proof is evident or the presumption great" that the defendant is charged with a detainable, non-probationable felony; (2) "the defendant poses a real and present threat to the safety of any person or persons or to the community"; and (3) "no condition or combination of conditions" can mitigate that threat. *Id*. §§ 110-6.1(a)(1), (a)(4), (e). Where parties to a pretrial detention hearing proceed solely by proffer, our review is *de novo*. *People v. Morgan*, 2020 IL 130626, ¶ 51.

¶ 19    With respect to dangerousness, the court may consider a variety of factors in making its determination, which may include, but are not limited to, the nature and circumstances of the charged offense, including whether the crime was a crime of violence; the history and characteristics of the defendant; whether defendant was on probation or parole at the time of the offense; any statements made by or attributed to the defendant; the age and physical condition of the defendant; whether defendant was armed with a weapon; and any other factor that reasonably bears "upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior ***." 725 ILCS 5/110-6.1(g) (West 2024).

¶ 20    Although our review is independent of the circuit court's judgment, we have little to add to it. As the second circuit court judge correctly recognized, the length of a knife alone is not dispositive of its character, and when it is used as a deadly weapon in the commission of a felony, the crime is appropriately treated as armed violence. 720 ILCS 5/33A-1(c)(2). Furthermore, the statutory authority, both the Criminal Code and the Act, compel that we treat crimes of violence involving a weapon as among the most serious class of offenses, especially where the intended victim is a police officer. 725 ILCS 5/110-6.1(g); see also 720 ILCS 5/12-2(b)(4).

¶ 21    We recognize that we have only a portion of the purported bodycam evidence, but what it depicts inarguably shows defendant's erratic and dangerous behavior. As to defendant's statements, we take defendant at his word that he intended to possibly kill a police officer—*i.e.*, to "kill all police"—if only to provoke the use of deadly force against himself. Such conduct is inherently dangerous, and it evinces zero regard for those in the community that might also be hurt or killed or even forced to kill defendant. Given defendant's demonstrated animosity towards law enforcement officers, who are obligated to respond to emergencies occurring in the community,

we agree with the circuit court that defendant is a real and present threat to the safety of the community based on the specific articulable facts of this case.

¶ 22    We further agree with the circuit court's determination that no pretrial release conditions could safely mitigate that danger, short of his detention. Potentially deadly and dangerous objects are ubiquitous, and no form of electronic monitoring could keep those items out of defendant's hands were he to be released. As other courts have noted, "electronic monitoring simply informs police that a defendant [has] violated his home-confinement restriction, but [it] does not provide much in the way of *prevention*." (Emphasis in original and internal quotation marks omitted) *People v. Reyes*, 2026 IL App (1st) 252639, ¶ 63.  Like the circuit court, we are also not encouraged by defendant's multiple violations of probation, but considering defendant's relatively minor criminal history, that fact alone is not dispositive. What is far more compelling is that no pretrial release restrictions could safely prevent defendant from engaging in the same conduct, or provoking a similar encounter with the police, with potentially lethal results.

¶ 23                                III. CONCLUSION

¶ 24    Even though we make our assessment independent of the circuit court's findings, we reach the same conclusion. Like the circuit court, we determine (1) that defendant is charged with a detainable offense, (2) that he poses a threat to the safety of the community, and (3) that no pretrial-release conditions could mitigate the danger he presents. Accordingly, and for the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 25    Affirmed.